MASON and TAGGART, Js., dissented from the foregoing opinion.

MORSE, J., being related to one of the parties, gave no opinion.

All the other judges concurring,

Judgment reversed and new trial ordered.

---

### THE PEOPLE *against* VAN RENSSELAER and others.

Royal letters patent granting lands in the province of New-York, are not void by reason of their conferring manorial privileges and franchises upon the patentees.

The statute of *Quia Emptores*, prohibiting subinfeudations, being made for the benefit of the superior lords, the king is not restrained thereby from authorizing his own tenant to grant lands to be holden of the tenant, since one may waive an advantage secured to himself.

Such grant of manorial privileges, if it were unauthorized, would not avoid the grant of lands in the same letters patent.

Such letters patent, issued in 1685, even if void by reason of such unauthorized grant, are confirmed and made valid by the colonial act of May, 1691.

The act of 1801 (1 *K. & R.*, 605–6, § 4), authorizing the commutation of quit-rents due to the state, is applicable where the rent was reserved payable in wheat, as well as in money.

The statutes of limitations of 1788 and 1801 may operate as a bar to an action by the people, to recover the possession of lands claimed under letters patent issued in 1685 and 1704.

Where the premises in question in such action were an unoccupied portion of the manorial grant, and the defendants had regularly paid taxes therefor,

and quit-rents to the state until commuted in accordance with the statute, and had maintained men to protect the timber from trespassers, such possession was held to be sufficient to give effect to the bar of the statute as to that part.

THIS action, framed under the fifth subdivision of § 143 of the Code of 1848, corresponding with § 167 of the present Code, was brought to recover real property, without damages for the withholding thereof, and is the substitute provided by the Code for the action of ejectment under the former practice. It was commenced in the year 1848, in pursuance of the concurrent resolution of the legislature of the 6th of April of that year, in relation to "manorial titles." (*Laws of* 1848, 582.)

The *complaint* alleges that the plaintiffs are the true owners in fee simple, and entitled to the immediate possession of a parcel or piece of land situate in the town of Poestenkill, in the county of Rensselaer (describing it by metes and bounds), and containing about one hundred and fifty acres of land. It avers that the defendants have entered into and taken possession of and now occupy, possess and enjoy the said land contrary to the said ownership and right of possession of the plaintiffs; whereupon the plaintiffs pray that the right, title and possession of the said land may be adjudged to them, and that the possession thereof may be delivered to them in due form of law.

The *answer* sets forth various defences. First, it alleges that one Killian Van Rensselaer, son of Jeremiah Van Rensselaer, in the year 1704 entered upon and took the lawful possession of a large tract of land known as the Manor of Rensselaerwyck, lying on both sides of the Hudson river, beginning at the south end of Barent Island, and extending up said river to the Cohoes Falls, and extending backwards on each side of said river twenty-four English miles, and containing in the whole more than seven hundred and twenty-six thousand acres of land, of which tract the premises described in the complaint were and are a part,

claiming to own and hold the said tract in fee, by virtue of a grant and patent of the same, bearing date the 20th May, 1704, issued by the then governor of the province of New-York, in which was reserved a rent of fifty bushels of good and merchantable winter wheat, payable yearly, and continued to hold the same during his life; that while so holding the same, and on the 11th June, 1718, the said Killian made his will, duly executed to pass real estate, and thereby devised the said tract including the premises in question (with certain exceptions not necessary to be stated), to his eldest son Jeremiah Van Rensselaer, and in case of his death without issue, to his second son, Stephen Van Rensselaer, and his heirs male in fee; and after the execution of said will and about the year 1719 he departed this life, and his son Jeremiah having died without issue, the said Stephen Van Rensselaer, about the year 1745, entered into the said tract, including the premises in question, claiming to hold under the devise from the said Killian Van Rensselaer, and leased divers parts thereof, reserving rent, &c., and so continued to hold during his life. That on the 24th June, 1747, he duly made his will and devised the whole tract, including the premises in question, to his only son, Stephen Van Rensselaer, and soon thereafter, in the same year, 1747, died, leaving his said son his only heir him surviving. That the last mentioned Stephen Van Rensselaer entered and held the said tract of land during his lifetime, making leases, &c., and, on the 30th August, 1769, he made his will, duly executed to pass real estate, and devised the said tract, including the premises in question, to Livingston and Ten Broeck in trust to the use of his eldest son Stephen, and the heirs male of his body, and in default of such issue then in trust for the use of his other sons and children in succession, in which devise the premises in question are included. Other provisions of the will are stated in the answer, but they are not material to the case under consideration. That after making said will the

said Stephen, the testator, died in the same year, 1769. That thereupon the trustees entered, occupied, and made leases, &c., until Stephen Van Rensselaer, the devisee, became of age in 1785, when he entered and took possession of the whole tract, and occupied, making leases, and receiving rent, &c., and collecting arrearages, and so held till his death, the 26th of January, 1839 ; that on the 18th of April, 1837, he made his will, duly executed to pass real estate, and thereby devised to his son, the defendant, William P. Van Rensselaer, in fee, all his lands in said manor on the east side of the Hudson river, embracing the premises in question. That the said William entered and became lawfully possessed thereof and continued to occupy, collecting rents, making leases, &c., until the 25th September, 1848, on which day he conveyed a part of the said premises, including the land in dispute, to the other defendants in trust for the payment of certain debts, &c., by virtue whereof they entered and became possessed lawfully, and have so continued to the commencement of this suit.

The answer then states that the possession of the several persons above mentioned has never been disturbed, but has been repeatedly recognized both by the colonial government and the government of this state since the revolution. That the rent has been paid by the several and successive proprietors of the manor, and received and accepted by the government, and finally, in 1806, the then proprietors commuted with the said state for said rents and paid a gross sum of money, which was received in full satisfaction thereof. The answer then sets up the forty years' statutes of limitation.

For a third defence the answer denies that the plaintiffs have title, or that they are the true owners and entitled to the possession of the premises described in the complaint, for that the said premises together with other lands were, on the 20th of May, 1704, duly granted by letters patent, issued by the governor of the colony of New-York, duly authorized for that purpose, to Killian Van Rensselaer, son of Jeremiah,

in fee, which letters patent also ratified and confirmed certain other letters patent bearing date the 4th day of November, 1685, duly issued by the then lieutenant-governor of the colony of New-York, duly authorized for that purpose, by which the said premises described in the said complaint; and the other lands described in the patent of 1704, were duly granted to Killian Van Rensselaer, son of Johannes Van Rensselaer, and Killian Van Rensselaer, the son of Jeremias Van Rensselaer, their heirs and assigns, to and for the only use and behoof of the right heirs of one Killian Van Rensselaer, grandfather to the said grantees and patentees, and which letters patent first above mentioned recite that the said Killian Van Rensselaer, son of said Johannes Van Rensselaer, some time in the year 1687, died without issue, whereby the said Killian Van Rensselaer eldest son of the said Jeremias Van Rensselaer, became solely seized and possessed of the premises described in the said letters patent dated November 4, 1685, and which said Killian Van Renselaer was the same person to whom the said letters patent first above mentioned were issued, who, upon the issuing thereof, entered under and by virtue of said patents during his life, and by his will dated June 11, 1718, devised the said premises, with other lands, to his son Jeremiah Van Rensselaer, and in case of his death without issue, then to his son Stephen Van Rensselaer in fee ; and then proceeds deducing title in the defendants as in the first defence. It then sets up the acts of recognition of the title of those claiming the premises by the colonial government, and by the state government, the payment of rent to both, and the commutation of the quit rents in 1806.

It then denies that the defendants occupy contrary to any ownership or right of possession of the plaintiffs, and avers that the defendants rightfully and lawfully occupy and enjoy the same under and by virtue of the said patents.

The *reply* first denies that in the year 1704, one Killian Van Rensselaer, son of Jeremiah Van Rensselaer, or any

other person in his behalf, made an entry and took possession of and held a certain large tract of land, situate in the present counties of Albany and Rensselaer, known as the Manor of Rensselaerwyck, lying on both sides of the Hudson river, and containing more than seven hundred and twenty-six thousand acres of land, as is described in the answer, and said to contain the premises described in the complaint in this action; *and they also deny that any person or persons have ever possessed the lands described in the complaint in this action in any manner whatever, and deny that the defendants, or any other person or persons, except the plaintiffs, are, or ever were entitled to the possession thereof.* The reply denies, secondly, that the governor of the province of New-York, or any other person properly authorized to issue grants or patents for land situate in said province, ever issued a grant or patent for the land described in the complaint, or that any valid patent or grant ever was made of said land, or any part thereof, or for any tract including the same within its boundaries, or any part thereof. Thirdly, that if any patent was ever issued, it was obtained by fraud, or upon false suggestions or concealment of some material fact on the part of the grantee or grantees, and was and is therefore void, &c. Fourthly, it denies that any of the devises, conveyances, &c., set forth in the answer were ever made, or that any quit-rents were ever paid, or commutation thereof made with respect to the lands in the complaint specified. It alleges that the lands described in the complaint belong to the plaintiffs, as sovereign of the country, and original proprietors thereof. Fifthly, the reply denies that either the colony of New-York, or the state since its independence, has, by any acts of its legislature, recognized the possession or claim of the defendants, or of those under whom they claim; and avers that the plaintiffs have been continually, since the revolution, and still are, the rightful owners of the premises in the complaint in fee simple, and entitled to the possession thereof, and that the defendants' claim, as set forth in the answer, is without

foundation, and not based upon any principle of law or equity.

The cause was tried on the 23d of January, 1851, at Troy, before Mr. Justice HARRIS, a jury trial having been waived by the parties.

On the trial the attorney-general read a stipulation, authorizing either party to read certain testimony from the bill of exceptions printed in the case of *Teunis Van Vechten* v. *Wm. Clute,* but gave no evidence, and claimed a judgment for the premises described in the complaint. To this the defendants' counsel objected; the judge overruled the objection and the defendants' counsel duly excepted to such decision.

The defendants' counsel then gave in evidence a duly authenticated copy, from the secretary's office, of letters patent granted by Thomas Dongan, governor of the province of New-York, under the seal of the province, dated November 4, 1685, in the first year of the reign of James the Second, granting to Killian, the son of Johannes Van Rensselaer, and Killian, the son of Jeremias Van Rensselaer, their heirs and assigns, all that and those tracts of land called Rensselaerwyck, beginning at the south end or part of Barent Island, on Hudson's river, and extending northwards up along both sides of the said Hudson's river into a place heretofore called the Cohoes, or the Great Falls of the said river, and extending itself east and west all along from each side of the said river backwards into the woods twenty-four English miles. It conveyed also other lands not necessary to be stated here, because the premises mentioned in the complaint are parcel of the premises above described. It declared the said grant to be in trust to and for the use and behoof of the right heirs and assigns of Killian Van Rensselaer, grandfather to the said Killian Van Rensselaer, party to these presents, yielding and paying a quit-rent of fifty bushels of wheat annually unto our sovereign lord, the king's majesty, his heirs and successors forever. The patent also erected the said granted premises

into a lordship and manor by the name of the lordship and manor of Rensselaerwyck. It further granted to Killian Van Rensselaer, party to these presents, and the heirs and assigns of Killian Van Rensselaer, grandfather of the said Killian, party to these presents, and their heirs and assigns forever, full power and authority at all times forever thereafter to hold a court leete and court baron in said manor. The patent contained, immediately preceding the granting clause, a recital in these words: "Whereas, Killian Van Rensselaer, merchant, late of the city of Amsterdam in the province of Holland, under the dominion of the States General of the United Provinces in Europe, and the heirs of the said Killian Van Rensselaer at his and their vast expense, cost and charges, have been the first settlers, planters and improvers of all that and those tracts of land hereinafter mentioned, not only during the government of the States General here, but since the same has been under the government and dominion of his now majesty; and, whereas, application hath been made to me by Killian Van Rensselaer, of the village or dorpe of Newkirk, in the province of Guilderland, in Europe, gentleman, naturalized by act of general assembly this present session at New-York, eldest son and heir of Johannes Van Rensselaer, deceased, who was the eldest son and heir of the said Killian Van Rensselaer, also deceased, for the granting, ratifying and confirming unto the heirs and family of the Rensselaers, not only the said tract and tracts of land, but also the liberties, privileges and preëminences hereinafter mentioned; Know ye, therefore, that I, Thomas Dongan, not only for the consideration aforesaid, but also in obedience, and in pursuance and performance of recent orders, directions and command of his said majesty, and by virtue of his said majesty's commission and authority to me given, and the power in me residing, have given, granted, ratified and confirmed, and by these presents do give, grant, ratify

and confirm unto the said Killian," &c. [as above has already been quoted].

The defendants' counsel also gave in evidence the exemplification of a patent granted on the 20th May, 1704, in the third year of the reign of Queen Anne, and issued by Lord Cornbury, then governor of the colony of New-York, which, among other things, recites the death without issue of Killian Van Rensselaer, son of Johannes Van Rensselaer, some time in the year 1687, whereby Killian Van Rensselaer, eldest son of Jeremias Van Rensselaer, became solely seized and possessed of the colony of Rensselaerwyck, with the hereditaments and appurtenances thereof; and after reciting at large the Dongan patent of 1685, before mentioned, and the existence of numerous other facts, which are noticed in the opinions of the court, it then grants, ratifies and confirms to the said Killian Van Rensselaer, eldest son of Jeremias Van Rensselaer, his heirs and assigns forever, the premises by metes and bounds, which were described and granted in and by the Dongan patent. The defendants deduced a regular title to the patent from the said Killian Van Rensselaer, whose will, dated June 11, 1718, was given in evidence, through the first Stephen Van Rensselaer, whose will, dated June 24, 1747, was given in evidence, and through the second Stephen Van Rensselaer, whose will, dated August 30, 1769, was given in evidence, and through the third Stephen Van Rensselaer, the late proprietor, whose will, dated April 18, 1837, was also put in evidence. The deaths of the respective owners occurred as stated in the answer. That part of the patent lying on the east side of the Hudson river was devised by the late Stephen Van Rensselaer to the defendant, William P. Van Rensselaer, in fee, and embraces the premises mentioned in the complaint. The deed of trust by William P. Van Rensselaer to the other defendants, conveying certain portions of the lands on the east side of the river, and

embracing the lands in dispute, in trust to pay debts, and dated September 25, 1848, was also given in evidence.

It was also shown that the premises in question are part of a tract of about two thousand acres of wild or unappropriated land, embraced within the bounds of the patent, and are surrounded on every side by lands sold or leased by the late Stephen Van Rensselaer. That the late Stephen Van Rensselaer always paid the taxes on said land, and was at considerable expense in preserving the timber against trespassers by hiring for that purpose " bush rangers," so called. It was shown that the several owners of the patent, from Killian Van Rensselaer to and including the late Stephen Van Rensselaer, claimed the patent according to its boundaries, and granted leases of portions thereof, reserving rents, and the lessees continued to pay said rents. Eight leases were given in evidence, by Killian Van Rensselaer to divers persons, dated 1696, 1702, 1705, 1707, 1715 and 1716. Other leases by other proprietors, down to 1772, were shown. Nineteen leases given by the late Stephen Van Rensselaer, from 1787 to 1807, mostly for farms situated in the town in which the lands in question are situated, and in the vicinity of and surrounding the premises in question, were also given in evidence. A lease, dated October 17, 1836, from the late Stephen Van Rensselaer to James Henderson, for lot number twenty-eight, on the map of Middletown, which is admitted by the parties to be the lot described in the complaint, and to be within the manor of Rensselaerwyck, as described in the patents therefor above mentioned, was also given in evidence, and it was shown that the said Stephen Van Rensselaer, said lessor, died January 26, 1839. It was admitted by stipulation that under the several leases above produced from the ancestors of the defendant, William P. Van Rensselaer, there had been a possession by the lessees respectively, coextensive with the leases, and that the rents reserved in said leases for the occupation of said

The People *against* Van Rensselaer.

land had been paid pursuant to the reservations, until within about ten years past.

It was also shown that the late Stephen Van Rensselaer, in the year 1806, commuted with the state for the quit-rents charged upon the manor, and received a discharge therefor from the comptroller. No objection, it is stated in the record, was made to the form or sufficiency of the evidence by which this fact was established, nor any question raised on the trial or arguments on the facts as to the payment of and commutation for the quit-rents on the whole manor, and the cause was argued in the court below as if such commutations had been fully proved.

The defendants' counsel also read in evidence various statutes of the colonial legislature, recognizing the manor, its boundaries and rights; as to one member of assembly, (*Bradford's ed. Colonial Laws*, 2, 3); as to choosing a supervisor (*ib.*, 63); to be part of Albany county (*ib.*, 11); concerning fairs in, &c. (*ib.*, 18, 20); as to defraying certain expenses in manor (*ib.*, 62, 66); confirming title to manor (*ib.*, 7); settling and assuring lands (*ib.*, 77.) Also, divers laws of the state, recognizing the existence of the manor, and establishing and bounding counties, cities and towns by its lines. (3 *R. S.*, 6, 137, 140; 2 *Webster's ed. Laws*, 30, 31, 38.)

The defendants also proved a statement of the number of leases of farms on the said manor, principally made between the years 1786 and 1800, showing the towns in which they were situated, and the aggregate amount of rent reserved, from which it appeared that there were three thousand and sixty-three farms held under lease, of which one hundred and ninety were in the town of Poestenkill, in which the premises in dispute lie; that the rent reserved on the leases on the west side of the river was twenty-three thousand three hundred and ninety bushels of wheat, and comprising about two hundred and thirty-three thousand nine hundred acres of land, and on the east side of the river twenty thou-

sand two hundred and ten bushels of wheat, and comprising about two hundred and two thousand one hundred acres of land. Other matters were proved on both sides, of which such parts as are material are noticed in the opinions.

The findings of the court to which exceptions were taken by the defendant were as follows: That there was no just claim for a grant of the extravagant character which the Dongan patent presents. That the grant was made in trust for all the heirs of Killian Van Rensselaer, the first patroon, and the subsequent grant to Killian Van Rensselaer, the son of Jeremias, in 1704, could not operate to divest those trusts. That he still held the premises upon the same trusts specified in the patent of 1685; and that whether those trusts were ever satisfied or not, the title of the plaintiffs would be divested, if the grant itself were valid. That the provisions of both patents, that of 1685 and that of 1704, whereby manorial privileges and franchises were conferred upon the lord of the manor, were in express violation of the established law, not only in England, but of the colony, and for this reason both grants were illegal and void. That the act of 1691, passed upon the accession of William and Mary to the crown of England, for the purpose of confirming certain grants, had no application to these patents. That the mere voluntary payment of quit-rents to the state could not have the legal effect of barring the right of the people, and that there was in this case no evidence of such a commutation of the quit-rent, under the act of 1801, as amounts to a release of the people's right.

The court gave judgment for the plaintiff for the recovery of possession of the premises. This judgment being affirmed at general term, the defendants appealed to this court.

*Charles M. Jenkins* for the appellants.

I. The supreme court erred in deciding: "That the provisions of both patents, that of 1685 and that of 1704,

whereby manorial privileges and franchises were conferred upon the lord of the manor, were in express violation of the established law, not only in England, but of this colony, and for this reason both grants were illegal and void." 1. The only franchise granted, which can be called manorial, is the right to have " a lordship and manor to all intents and purposes, and to hold a court baron." All other privileges and franchises granted by the patents, have no necessary connection with manors, and could be and often were granted without manors or land. (*Comyn's Dig.*, *Franchise and Prerogative*, D, 28, 30, 32.) 2. The grant or erection of a manor gave the grantee the right to parcel out the tract to be held of him by his tenants. (*Coke's Law Tracts*, 49; *Cruise on Dignities*, 24.) Such grants were valid at common law, as the existence of manors proves; and if they are now prohibited, it must be by statute. (*Dalrymple on Feudal Property*, 280.) 3. There never was a statute which was intended to or did, either prohibit the king from making any of the grants contained in these patents, or declare patents containing such provisions void. 4. The statute called *quia emptores*, is adjudged in this case to have the effect of " preventing the creation in future of those tenures which were necessary to the subsistence of manors," and of rendering a grant of this particular franchise by the king illegal, which is conceded to have been legal before. (2 *Reeves' Hist.*, 66; 2 *Inst.*, 500.) 5. This statute did not apply to the king nor his grants, nor to those who held of the king *in capite*. (1 *Watkins' Cop.*, 20; *Lit.*, § 140; *Co. Lit.*, 43, b; *Gilb. Tenn.*, 85; 3 *Preston on Ab.*, 53, 54; *Plowd.*, 240.) The king has, ever since that statute, by every grant of lands not at the time in tenure, created a tenure between himself and his grantee. 6. This statute, by its terms, could not apply until a tenure existed, for it affected only those grantors who held of some superior lord; therefore, the statute could not affect the grant from the king to Van Rensselaer, for that brought the superior lord

and first tenant into existence, to whom the statute could apply. It was made to prevent further subinfeudations, and not new primary infeudations by the king. 7. This statute, if applicable, did not forbid or prevent the king from granting the land and jurisdiction and calling it a manor. It affected only Van Rensselaer's power to create tenants to hold the court baron, by giving a different effect to his grants from what they would otherwise have. The king alone never could and never did create or bring into existence a perfect manor. He could grant the land and jurisdiction, and the franchise or right to have a manor, yet there was not a perfect manor until the king's grantee conveyed parcels to at least two freeholders holding of him to make the court baron. (*Coke's Law Tracts, Copyholder,* 53 ; 2 *Bl.*, 90, *and note* 14.) 8. The statute applied to lands without as well as within manors, and its effect to prevent the further creation of submanors by common persons, was not intentional but accidental and consequential. It prevented the creation of manors only where it prevented subinfeudation, and by that means. One practical effect has often been mistaken for and stated as the object and intent of the statute. (*Coke's Copyholder,* 47 ; *Cruise on Dignities,* 25.) 9. The "franchise of having a manor or lordship," could be granted by the king (2 *Bl.*, 37); with this the statute *quia emptores* has nothing to do ; it is simply an agreement by the king that another person than himself shall be the chief lord of subsequent grantees, and have the escheats and other fruits of tenure. This may be effected by a grant of a "seignory," "manor," or any grant having that intent, and when this is done such grantee becomes the chief lord, of whom the successive grantees are by statute *quia emptores* to hold. (*Jacob's Law Dict., Seignory, Seignor; Comyn's Dig., Seignory;* 1 *Chalmers' Op.,* 122.) That statute does not declare or determine who shall be the future "chief lord" of lands not then in tenure, and the king's prerogative and grant can determine that as between

the king and his grantee, as well since as before the statute. 10. Manors have been created in England since the statute *quia emptores*, by the grant of the king. ( *Molyn's case*, 6 *Coke's R.*, 6 ; *Bewley's case*, 9 *id.*, 130, 131 ; 3 *M.* & *R.*, 353, *note a ;* 2 *Scriv. Law of Copyhold*, 758.) This of course could not happen often, as the land in England was all in tenure when this statute was passed, and would ordinarily happen only where tenures were extinguished by forfeiture for treason. ( *Comyn's Dig.*, *Tenure*, *B.*) The *dicta*, to the effect that the king could not create a new tenure, or a manor, must be confined to the subject of which they were all spoken, i.' e., manors with copyhold tenures, which depend upon custom, and which the king could not create because he never could create a custom. ( *Coke's Copyholder*, 45, 46.) They all relate to what Coke calls a perfect manor, i. e., a manor having copyholds and a customary court. The court baron is of two natures : 1. By common law, which is the baron's or freeholder's court ; 2. By custom, which is called the customary or copyholder's court. The court may be of this double nature, or one may be without the other. (1 *Co. Lit.*, 58, *a.*) The citation in *Cruise's Dig.*, *tit. Tenures*, *ch.* 3, § 44, from *Coke's Complete Copyholder*, that " if the king at this day grants a great quantity of land, enjoining certain duties and services, and willeth that it bear the name of a manor ; it will not be 'a manor in the estimation of the law," will be found when read with the context to mean that it will be a manor without copyholds and customary court, and therefore not what Coke considered a " perfect manor." ( *See Coke's Law Tracts*, 46, 47, 49, 53.)

II. The statute *quia emptores* was never adopted or recognized by the colonists as forming a part of the law of the colony. This is shown, 1. By the adjudications of the state court. ( *Jackson* v. *Schutz*, 18 *John.*, 179 ; *De Peyster* v. *Michael*, 2 *Seld.*, 467.) 2. By the repeated creation, confirmation and statute recognition of manors in New-York, from 1671 to 1715, under the successive reigns of James II.,

William and Mary, Anne and George I., and the earlier government of the Duke of York. ( *See the records in the secretary's office, of the several similar patents for the manors of Tisdale, Gardiner's Island, Martha's Vineyard, Livingston, Scarsdale, Foxhall, Philipsburgh, Rensselaerwyck, Fordham, Cassiltown, Bently, Pelham, Courtland, St. George; as to Kingfield and Fletcherdon, see Brad. ed. Col. Laws,* 37 *to* 40.) The acts and usages of a government are the best guides to the law. (5 *Denio,* 396.) Ancient charters, which by modern law would be insufficient or void, must be sustained according to usage and the law of their time. ( *Viner's Ab., tit. Grants, H,* 13, § 13; 2 *Hilliard's R. Prop.,* 324, § 11; 2 *Phil. Ev.,* 346; 3 *Term R.,* 604.) 3. By the law as it existed in the colonies having proprietary charters, where manors and tenures under the proprietors were authorized and existed, and where escheats went to the proprietors or the public treasury, and not to the king. (*Maryland Charter,* §§ 18, 19; *Hoffman's Legal Outlines,* 594; 10 *Gill & John.,* 450; 1 *Har. & McH.,* 190, 297; 2 *id.,* 121; *Pennsylvania Charter,* §§ 18, 19; 1 *Whart.,* 337; 9 *Wheat.,* 241, 316; *Laws of Penn.,* 1799, *vol.* 3, 284; *North and South Carolina Charters, and early Laws;* 2 *Carroll's Hist. Col. of S. Car.,* 42, 50, 51, 362 *to* 390; *Georgia Charter, and Proprietary Laws;* 2 *Grahame's Col. Hist.,* ed. *of* 1852, 117; *and see Trott's Laws of N. Car.,* 35, *and Grimke's Laws of S. Car.,* 26; 3 *Binney's Rep.,* 599, *as to Penn.; and Kilty's Rep., in Maryland, as to English statutes adopted or in force; as to Canada,* 2 *Burge Com. on Colonial Laws,* 395; 2 *How. Colonial Laws,* 24.) In New Jersey, the escheats which would have belonged to the Duke of York, as chief lord, merged and went with all his ungranted lands to the crown when he became king. (*Allen on Prerog.,* 162, 163; *Comyn's Dig., Prerog., D,* 64.) So of lands held under the duke's title in New-York. As to lands held under these titles, therefore, the crown would have been entitled to the escheats mentioned in 1 *Chalmers' Opin.,* 122, 123, as the successor to the duke's rights, and

The People *against* Van Rensselaer.

not as his superior lord. In Virginia, the crown in 1625 resumed the rights of the brief proprietary establishment. (1 *Grah. Hist.*, 80.) In Massachusetts the escheats did not go to the king. (*Ancient Charter and Laws of Mass.*, 109.) 4. By the decisions of the English courts and officers of that age and the colonial councils, as to the law, and the king's power of making laws in the colonies. (*Smith* v. *Brown*, 2 *Salk.*, 666; *Campbell* v. *Hall*, 1 *Cowp.*, 210; 1 *Chalm. Op.*, 141, 198, 233; 1 *Grah. Hist.*, 301; *Am. Char.*, *Introd.*, 16; 1 *Burge's Com. on Col. Laws, Preliminary Treatise*, 45; *Chalm. Political Annals*, 168, 677.) 5. The statute was made " to uphold and preserve the feudal tenures and estates of the chief lords and great men in England," and restrain the tenants and deprive them of the right and power which the common law gave them to make subinfeudations (2 *Inst.*, 66; 3 *Kent*, 508), and was not adapted to or necessary for the colonists. They were the judges as to what laws should be in force, and they never adopted it expressly or by implication or usage. (15 *John.*, 115; 2 *Wils. Lec.*, 53, 54; *Smith's Hist. of N. Y.*, ed. *of* 1814, 371, 372, 382; 8 *Peters*, 659; 1 *Story on the Constitution*, 125; *How. Col. Laws*, *Int.*, xii.; *Const. of N. Y.*) 6. The most of the statute law, and much of the common law of England, never was adopted or in force in the colonies. (*See Ins. Co.* v. *Bay*, 4 *Comst.*, 9, *as to conveyances by married women; Denn* v. *Pissant*, 1 *Coxe's N. Jersey R.*, 220, *as to Stat. of Lim. of James* I.; 1 *Wend. Bl.*, 436, *note* 6, *and* 439, *note* 14, *as to marriage;* 1 *Chalm. Revolt of the Colonies*, 395, *as to the Habeas Corpus Act;* 3 *Reeves' Hist. Eng. Law*, 225, *as to laws concerning the king's grant; see also* 1 *Bl. Com.*, 107, 108.

III. If the statute was in force, the king, as lord paramount, could waive the benefit of it to himself, and license his grantee to make tenants holding of him. (3 *M. and R.*, 353, *n. a.*; 2 *Inst.*, 501; *Bacon's Abr.*, tit. *Tenure*, *B;* 1 *Watkins' Copyhold* 20, *and note d. and* 21; *Co. Lit.*, 43 *b.*, 98 *b.*, 99 *a.*, *Hargraves' note to Frankalmoign*, 108; 6 *Rep.*, 6;

9. *ib.*, *T. B.*, 130, 131; *Baker* v. *Braman*, 6 *Hill*, 47; *Vin. Abr.*, *Tenure*, *E*, 10.) 1. Such "*license and authority*," at least, are given in all the proprietary charters of the different colonies before cited, in express terms (see charters before cited), and the proprietors authorized to make manors, baronies, dignities, laws, &c. The king could certainly grant the franchises of a manor in New-York, if he could authorize proprietors in other colonies to do so. 2. Such license and authority, if necessary, were granted to Van Rensselaer by the grant and erection of a "*lordship and manor to all intents. and purposes*," and the right and jurisdiction "*to hold and keep a court baron.*" These grants would be nugatory, if they did not, either by conveying the franchise of a seignory or lordship, or by licensing the mesne lord to create a tenure, carry the necessary power to make freeholders bound to suit at court, without which neither a court baron nor manor could exist. All powers necessary to enjoy and carry out the main grant are given (1 *Kent's Com.*, 464; 1 *Comst.*, 20); for "in morals he who gives the end gives all things that conduce to the end." ( *Grotius on War and Peace, fol. ed., bk.* 2, *ch.* 14, § 11, *subd.* 2.) This license would apply and extend to the king's tenant only, and not to inferior tenants, and did not amount to a "*dispensation*," in its objectionable sense, of the statute. (3 *Co. Lit., Hargraves' Note*, 108, *to Frankalmoigne.*) 3. If this license or authority had amounted to a dispensation of the statute, as to this tract, or as to the whole colony, even that power was at that day vested in and exercised by the king. (1 *Grahame's Col. Hist.*, 304; 1 *Chalmers' Opinions*, 141, 169, 233; *Chitty's Law of Prerog.*, 33; *Bacon's Abr. Prerog. D*, 7; *Plowden's. Rights of Englishmen*, 344; 5 *Petersdorff's Abr.*, 539, 544; 2 *Shower*, 475; *Statute of* 1 *Wm. and Mary, sess.* 2*d, ch.* 2, §§ 11, 12; 6 *Hume's Hist. of England*, 306.)

IV. The grant of the land was not void, if the franchise of a manor did not pass by the patents. The land is the

principal; the franchises are separately granted, and are mere incidents. The franchise of a manor or lordship, and court baron, are often separated from the land, and are often suspended, revived and destroyed. (1 *Watkins' Cop.*, 19 (14), 30 (21); 2 *Bl. Com.*, 90, 91, *and notes; People* v. *H. Livingston*, 8 *Barb.*, 283.)

If the king had not the power to create a manor, his attempt by words to do so is only futile; it is neither *malum in se* nor *malum prohibitum;* it is ineffectual and useless, but *utile per inutile non vitiatur.* (*See Darling* v. *Rogers*, 22 *Wend.*, 488, *opinion of* COWEN, J.)

If the statute had declared " every grant of manorial franchises illegal and void," even that would not have rendered other grants in the same deed void. (*Kerrison* v. *Cole*, 8 *East*, 231; *Gaskell* v. *King*, 11 *ib.*, 166.) The statute must declare the deed wholly void, and then it is void only as to the parties affected, even where the making of the deed is also made a misdemeanor. (*Livingston* v. *Proseus*, 2 *Hill*, 527; 1 *R. S.*, 739, *as to deeds of land adversely possessed;* 1 *R. S.*, 772, *as to usury.*) And if a deed cannot take effect as the parties express, yet it shall take effect as it may, rather than that the deed shall be void. (*Viner's Abr.*, *Grants*, H, 18, § 4.)

The decision of Judge Harris, reduced to a principle, is, that the grant of the land is void because in the same patent the king, without being deceived by the grantee, attempted to create a franchise, which did not belong to any other person, but which the king could not effectually create, having mistaken the law as to his prerogative, not to the injury of himself or any other person except the grantee, who cannot get all he ought to have, and therefore shall not have what the king could lawfully grant. This principle was condemned " by all the judges in England," in *Jenkins' R.*, 251, *case* 42, and has never prevailed even in England. (*Rex* v. *Kempe*, 1 *Lord Raym.*, 49.) If less pass by the king's grant than he intended, the grant is

good. ( *Chandos' case*, 6 *Rep.*, 55 ; *Gledstone* v. *Sandwich*, 4 *Man. and Gr.*, 1028 ; *Arkwright* v. *Cantrell*, 7 *Ad. and El.*, 565.) The patent would have been good if it had contained a grant of the right to kill every person who entered upon the land, which would be quite as " express a violation of the established law " as the grant of manorial privileges. " A feoffment on condition that the feoffee shall kill J. S. is absolute, and the condition only is void." ( *Coke Lit.*, 206, *b.*)

The general rule is, that if the good part of a deed be separable from and not dependent on the bad, only that part is void which contravenes the statute. (*Chit. on Cont.*, *ed. of* 1851, 593, 597, 598 ; 8 *East*, 231, *and* 11 *ib.*, 166, *ante ;* *Greenwood* v. *Bishop of London*, 5 *Taun.*, 727 ; *Patterson* v. *Jenks*, 2 *Peters*, 235 ; *Doe* v. *Pitcher*, 6 *Taun.*, 359 ; *People* v. *Mauran*, 5 *Denio*, 397 ; *Arkwright* v. *Cantrell*, 7 *Ad. and El.*, 565.) In this case the grant of the land is separable from and not dependent on the grant of the manorial franchise. " Manor in these days signifieth the jurisdiction and royalty incorporate, rather than the land or scite." (*Coke's Law Tracts, Cop.*, 52.) · The land and the manor may be separately leased. ( *Tanfield* v. *Rogers*, *Cro. Eliz.*, 340.) " A man may have *a manor in gross* (as the law termeth it), that is, the rights and interests of a court baron, with the perquisites thereunto belonging, and another or others have every foot of the land." (1 *Watkins' Cop.*, 31 (21) *note c.*)

V. The action of the people is barred by at least three statutes of limitation, particularly the statute of 1788, *ch.* 43, which differs from all the subsequent statutes. (2 *Greenl. ed.*, 93.) 1. There is a short limitation (i. e., to January 1, 1800) for suing on existing claims like this. 2. There is a statute grant of the people's title, in cases like this, which is the best possible title. (2 *How.*, 319; 2 *Wheat.*, 198.) 3. There are express provisions as to manors, to the effect that the possession of a manor, as such, was a possession within the statute of all the lands, waste or otherwise, parcel of the manor ; and that the people will not sue for

The People *against* Van Rensselaer.

any lands, parcel of a manor, unless the people have been in possession of the manor, of which the lands are parcel, within forty years. 4. These "parts of" this statute, or at least their effect on "*rights accrued*," have never been repealed. (*Repealing Stat. of* 1801, *ch.* 80; 1 *Webs. ed.*, 619, *ch.* 189; 5 *Hill*, 221; 2 *Barb.*, 316.)  5. While this act was in force, and after January 1, 1800, three "*rights accrued*" to defendants under it. (1.) A bar to any action of the people. (8 *Blackf.*, 506; 9 *How.*, 522, 530; 7 *B. Monroe*, 162.)  (2.) That affirmative new title which accrues by the possession, adverse to the real title for the time prescribed by the statute. (8 *Wend.*, 440; *Angell on Lim.*, 398, *ch.* 31, §§ 2, 3, 4; *ch.* 1, § 2; 2 *Bl. Com.*, 266, *n.*)  (3.) The right or title given by the granting part of the statute, which is no part of the statute of limitations, and is entirely omitted from the Revised Statutes. This right is irrevocable. (*Smith's Com. on Stat.*, 896; 17 *Viner's Abr.*, 80; 6 *Cranch*, 87, 137; 9 *ib.*, 43, 52; 2 *McCord*, 354; 17 *John.*, 195; 8 *Sm. & Marsh.*, 9.)  6. If the acts of 1801 and 1813 are mere revisions, intended to embrace all the statutes of 1788, then the new statutes must be construed as if they contained all the provisions about manors by name, contained in the old one. (2 *Caines' Ca.*, 151; 4 *John.*, 359; 21 *Wend.*, 316; 2 *Hill*, 380.)  7. If the revisions were alterations in substance and effect of the old statute, then, in construing the old one, full effect must be given to those portions omitted in the new, and as to which the law has been altered.

VI. Under the statutes of limitation of 1801 and 1813, the defendants' possession was sufficient to bar the people. 1. The people were claiming and collecting quit-rents for the whole of the manor, and they cannot say the defendants were not in possesion of a parcel of land, when they were receiving rent for it from the defendants as their tenant. The people have no such prerogative. (2 *R. S.*; 639, *3d ed., and Revisors' notes to* § 14.)  2. The manor, known, bounded and recognized by numerous statutes, deeds and charters,

contained waste lands, of which the premises claimed are part, subject to the common rights of the tenants, and thus occupied in the only way it could be, and in a way known to the law and obviously contemplated in the statute of 1788, and by the Revised Statutes. (2 *R. S.*, 392, § 10, 3*d ed.*) 3. The occupation of the whole tract, under a patent with definite bounds, by leasing and selling parcels, paying taxes and rent, granting commons, driving off trespassers, &c. (12 *John.*, 357; 10 *Wend.*, 639; 4 *Paige*, 174), was all the possession which the law required, considering the situation of the country and the nature of the property. (5 *Barr*, 492; 1 *Greenl.*, 17; 1 *Watts & Ser.*, 324; 1 *S. & R.*, 111; 3 *John. Ca.*, 109, 118; 1 *Caines*, 90; 4 *Mass.*, 416; 4 *Wheat.*, 213; 4 *Denio*, 209; 5 *Pet.*, 353; 10 *ib.*, 414; 7 *Cranch*, 606; 8 *ib.*, 274; 6 *Cow.*, 663.)

VII. The legal existence of manors in this state has been so often and directly recognized by the statutes of the state and colony, that the courts cannot now deny their existence or validity. (1 *R. L.*, 71, §§ 3, 5; 2 *Laws of N. Y., Greenl. ed.*, 93; *Brad. ed. Col. Laws*, 2, 3, 7, 11, 18, 20, 62, 63, 66, 77; 2 *Laws of N. Y., Web. ed.*, 4, 30, 31, 38; 3 *R. S.*, 6, 137, 140; *as to the legal effect of such statute recognitions, see* Smith v. Smith, 2 *Price*, 101; People v. Manhattan Co., 9 *Wend.*, 351; The King v. Sutton, 4 *Maule & Sel.*, 532.)

VIII. The possession of the manor, as such, with its demesnes, wastes and services, for nearly two hundred years, under three successive governments, through three or four revolutions, the recognition of its existence by charter and statute, and the receipt of rent by all these governments, and the commutation of the quit-rent by the people, are sufficient to give a title. Lord ELLENBOROUGH says, in *Roe* v. *Ireland* (11 *East*, 283, 4), "In support of such a possession, he would *presume the king's grant or anything which could be presumed;* and that Lord KENYON had said, he would presume not only one, but one hundred grants;

The People *against* Van Rensselaer.

if necessary, to support such a long enjoyment;" and such presumption of grant was made where a patent was produced and relied upon. (12 *Coke*, 5; *see also* 1 *Jac. & Walk.*, 162; 1 *Caines' R.*, 90, *n.*; 3 *John. Cas.*, 109; *Best on Presump.*, 107, 108, 109, 145; 1 *Phil. Ev.*, 161; *Cowp.*, 110; 5 *Serg. & Rawle*, 509; 3 *Verm.*, 542; 2 *Henry & Mumf.*, 370; 1 *Vesey Sen.*, 454.)

IX. The judge erred in deciding that the original patent created a trust. The statute of uses on which the conveyance by lease and release, then universal in the colony, was founded (4 *Kent's Com.*, 495), had been practically adopted in the colony, and executed the use, and vested the legal title in the heir or assignee of Killian Van Rensselaer, the original patroon. (*Cruise's Dig.*, tit. *Trust*, § 31.) If that statute had not been in force, the same effect would have been produced by merger (4 *Paige*, 403), because one of the grantees was the heir, both by the English law of primogeniture, and the Dutch law of succession, by which feudal estates like this were indivisible, and descended to the eldest male successor. (*Grotius Dutch Juris.*, 230, 232, § 5; *Van Leeuwen's Com.*, 167, § 6; 172, § 2; 173, § 5.) In English patents, the plural word heirs, means heirs in succession, and not children.

X. The judge erred in deciding that there was no evidence of the payment of, and commutation for, quit-rents. The comptroller fully commuted and released the upper manor, and the legal presumption, if any is necessary, will be, that the residue of the manor had been previously commuted for, if that was necessary to the commutation on this part. (1 *Laws of* 1801, *Webs. ed.*, 607; *Jackson* v. *Marsh*, 6 *Cow.*, 281; 5 *Denio*, 389; 9 *Cranch*, 87; 8 *Barb.*, 283; *Cow. & Hill's Notes, part* 1, 439.)

*L. S. Chatfield* (attorney-general) for the respondents.

I. The title of the plaintiffs to the *locus in quo* "rests in their right of sovereignty." They are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of the state. (*Constitution*, § 11, *art.* 1.) The land being vacant, the plaintiffs' case was perfect without proof, in the first instance. (*People* v. *Denison*, 17 *Wend.*, 312; *Wendell* v. *The People*, 8 *Wend.*, 183.)

II. The defendants have shown no adverse possession. It is not pretended that this particular lot has been in any manner occupied for forty years prior to the commencement of this suit. The tract was long ago subdivided into lots, and by statute "the possession of one lot shall not be deemed a possession of any other lot of the same tract." (2 *R. S.*, 294, § 9.) Each lease produced is good to uphold a possession under it, and to that extent and that only can it inure to the benefit of the landlord. In this case actual possession is required. (6 *Cow.*, 623; 1 *Cow.*, 276; 4 *Dev.*, 232; 8 *Wend.*, 183; 1 *Murphy*, 414; 6 *Cow.*, 680; 3 *R. S.*, 2d ed., 700.)

III. Neither the statutes of the colonial legislature nor of the state, which were read in evidence, can operate to divest the people of their title to the public property. Such an act is presumptively injurious to the people, and falls within that class of statutes which must be strictly construed. It must contain clear words of conveyance or release, manifesting an unequivocal intention of the legislature to surrender the property of the people, or it cannot have that effect. Such an intention cannot be implied from mere descriptive words of boundary, or of assent to the settlement of disputes by individuals. (*Cooper* v. *Cory*, 8 *John.*, 385.)

IV. The act of 1691 could not operate as a grant, or the confirmation of a grant. It was an act of political amnesty, and did not profess to cure any evils not growing out of the disturbance of the times. It was so understood by the government and by this patentee, for in 1703 we find him

applying for a grant of confirmation, and the government acting on that application.

V. Executive and administrative officers must act within the scope of the powers conferred on them by law, or their acts are void, and no act of a public officer can bind the state, unless it is so ordained by statute. The receipt by the treasurer or comptroller of quit-rents could have no effect on the title of either the plaintiffs or defendants. It was a mere administrative act, not coupled with a power to determine a question of title or of the sufficiency of the payment. There was no commutation of the quit-rent pursuant to the act of 1802, for the reason that the provisions of that act were not strictly complied with. Where a state is a party, nothing short of an affirmative legislative act can operate to ratify the acts of its agent. Omission to act will not do (*Delafield* v. *Illinois*, 26 *Wend.*, 192; 2 *Hill*, 159; *Camden* v. *Lansford*, 4 *Dev. & Batt.*, 407), and in this case the statute only intended to discharge the quit-rents.

VI. The patent of 1704 was void, for the reasons which will be given hereafter while considering the patent of 1685, and for the additional reason that the government had before granted the same premises. (*New Orleans* v. *D'Armas*, 9 *Peters*, 224; 5 *Cranch*, 234; 2 *Marsh*, 28.)

VII. The Dongan patent of 1685 was void, because: 1. It is a patent from the provincial governor, and not from the crown or an officer of the crown. 2. It was sealed with the ducal and not the royal seal. 3. There is no authority to issue patents contained in the king's grant to the Duke of York, and if there was, this power could not be delegated to an agent or subordinate. 4. It erects a manor or lordship, which the king in person had no power to do. The power to erect a manor ceased to be a royal prerogative, in the reign of Edward I., having been taken away by the statute of *quia emptores*. (*Comyn's Dig.*, tit. *Copyhold*, 2, 3; 2 *Bl. Com.*, 92; *Gilbert on Tenures*, 434,

*note* 90 : 2 *Roll.*, 120, 1, 10 ; *Crabb's Law Real Prop.*, 88 ; *Cro. Eliz.*, 39 ; 38 *Law Lib.*, 3d ed., ch. 15 ; *P. Wms.*, 75 ; 1 *Kent's Com.*, 473 ; 5 *Wend.*, 445 ; 5 *Peters*, 241.). If this power remained in the crown, it could not be delegated. (8 *Bac. Abr.*, *tit. Prerogative, F.*) But the statute of Edward applied to the colonies. The principle is this, and it is fundamental in English law, that " if an inhabited country is discovered and planted by British subjects, the English laws are immediately in force there, for the law is the birthright of every subject." (1 *Story's Com. on the Const.*, 99). There is this necessary limitation implied, that they carry with them all the laws applicable to their situation, and not repugnant to the local and political circumstances in which they are placed. (*Ib.*, 104, § 157, *ib.*, 122, *note* 1.) This proposition includes not only the common law, but the English statutes. (*Commonwealth* v. *Leach*, 1 *Mass.*, 60, *per* SEDGWICK, J. ; *Commonwealth* v. *Knowlton*, 2 *Mass.*, 534 ; 2 *P. Wms.*, 75 ; *Page's Case*, 5 *Rep.*, 53 ; *Blankard* v. *Galdy*, 2 *Salk.*, 411 ; *Patterson* v. *Winn*, 5 *Pet.*, 241 ; *Van Ness* v. *Pacard*, 2 *Pet.*, 143 ; *Terrett* v. *Taylor*, 9 *Cranch*, 46 ; *Pawlet* v. *Clark*, 9 *Cranch*, 292 ; 5 *Pet.*, 233 ; 7 *Pet.*, 976 ; *Beshem* v. *Engle*, 1 *Dal.*, 19 ; *Wilford* v. *Grant Kirby*, 8 *Pick.*, 309 ; 1 *Kent's Com.*, 173 ; *Bogardus* v. *Trinity Church*, 4 *Paige*, 198 ; *Canal Commissioners* v. *People*, 5 *Wend.*, 445.) This rule applied as well to statutes affecting the royal prerogative as to any other, with this qualification, " that if the charter of the particular colony contained any express provision on the subject, that was the guide." If it was silent, then the royal prerogatives were in the colonies precisely the same as in the parent country, for in such cases the common law of England was the common law of the colonies for such purposes. (1 *Story's Com.*, 127, § 184.) It must be conceded that if the statute in question was applicable to the situation of the colonies, it was subject to the general principle established by the cases cited ; and it is too apparent to admit of doubt, that in no country on earth was protection

from a servile tenure so necessary as in the American colonies. There was nothing on which these statutes could act in any of the colonies except New-York, and no rule found in the adjudications of any of the other states has any force here.

It is no answer to say that the grant was good for the lands, although void as to the lordship. The two were inseparable; for every manor must consist of demesne and services (*Comyn's Dig.*, *Copyhold*, *Q.*, 1), and the demesne is parcel of the manor. (*Ib.*, *Q.*, 2; 2 *Rol.*, 121, 1, 30.) The lands and the services are the *gravamen* of a manor, "for if the lord lease, reserving rent, the reversion is parcel of the manor." (2 *Rol.*, 120, 1, 50.) To every manor a court baron is incident (*Comyn Dig.*, *Copyhold*, *R.*, 1), and there cannot be a manor without a court baron, nor a court without two suitors, nor a court baron without freeholders. (*Ib.*, 2, 5, *and R*, 1; 2 *Bl. Com.*, 91.) It is essential to a manor that there be tenants who hold of the lord, and this, since the statute of Edward I., could not be done, because the grantee of the manor could create no tenants to hold of himself. (2 *Bl. Com.*, 92.) This grant was in conflict with the statute *prærogativa regis* (17 *Edw.* II.), to prevent subinfeudations. The royal grant was to James, who was prohibited by that statute from carving out of the granted estate lesser lordships, to be held of the mesne lord. The tenures granted by the proprietors of this manor were purely incident to lordships, for they all exact base or *villein* service, and the attachment of the tenant to the lord was compelled by onerous stipulations in the lease. The grant was made as a manor; it was received as a manor; it has been held as a manor, and leased as a manor, and it is now too late to claim that it shall operate as a grant of lands merely.

VIII. The patent is void because of the false suggestions and recitals which it contains. 1. The recitals and statements of inducing facts, in a patent, are the suggestions of the patentee. (*Jackson* v. *Carver*, 4 *Peters*, 87; *Hindmarsh on*

*Patents, Law Lib.*, 42. 378; 6 *Coke*, 55, *b*; 1 *Coke*, 43; 5 *Coke*, 55; 10 *Coke*, 112.) 2. If any of these material recitals or suggestions are false, the grant is absolutely void. (*Cases cited to last point; 2 Bl. Com.*, 348; *The King v. Clarke, Freeman, K. B.*, 172; *Swain v. Holman, Hobart*, 203; *Moore*, 318; *Sawyer v. East, Lam.*, 108; *Butt v. Johnson, Lane*, 1; *Queen v. Vaughan, Cro. Eliz.*, 507; *Morgan v. Seaward*, 2 *Mees. & Wels.*, 544; *Alcock v. Cooke*, 5 *Bing.*, 346; *Earl of Devonshire's Case*, 11 *Rep.*, 89; *Alexander v. Greenup*, 1 *Mumf.*, 134.) 3. The *onus* of showing the recitals to be true rests with those claiming under the patent when it is attacked by the sovereign; but in this case the recitals are shown to be false.

WILLARD, J. This was not an action brought by the people, under 2 *R. S.*, 578, § 12, or under § 433 of the Code of 1849. to vacate either the Dongan or the Cornbury patents mentioned in the pleadings. Whether such action could be maintained at this day, to vacate patents granted by the crown a century and a half ago. it is needless now to inquire. (*People v. Clarke*, 10 *Barb.*, 120.)

The action, on the contrary, is in the nature of an ejectment, though not called by that name since the adoption of the Code of Procedure. It is believed, however, to be governed by the principles which the legislature has established in relation to that action. By the Revised Statutes, it is enacted that no person can recover in ejectment, unless he has at the time of commencing the action a valid subsisting interest in the premises claimed, and a right to recover the same, or to recover the possession thereof, or of some share, interest or portion thereof, to be proved and established on the trial. (2 *R. S.*, 303, § 3.) If the premises for which the action is brought be actually occupied by any person, such actual occupant must be named defendant in the declaration; if they be not so occupied, the action must be brought against some person exercising acts of ownership

The People *against* Van Rensselaer.

on the premises claimed, or claiming title thereto, or some interest therein, at the commencement of the suit. ( *Ib.*, § 4. ) These principles are alike applicable to the people, when prosecuting an action to recover the possession of land, and to private persons. The former as well as the latter must, to entitle them to a recovery, establish a valid and subsisting title in themselves, and right to recover possession at the time the action was commenced, and show that the defendants were in possession or claimed title to the premises in dispute. With respect to making out the proof of title in themselves, the people have an advantage over an individual. By right of sovereignty, they are deemed the owners of all the lands within the state, except such as have been granted to others, or have been lost by lapse of time. Hence, it is enough for the people to prove, in the first instance, that the premises in dispute were vacant and unoccupied within a period necessary to constitute an adverse possession against them, and that the defendants subsequently entered or made claim to them. ( *Wendell* v. *The People*, 8 *Wend.*, 183 ; *The People* v. *Denison*, 17 *ib.*, 312 ; 1 *R. S.*, 718, § 1 ; *Constitution*, § 11, *art.* 1. ) At the time the counsel for the people rested the cause in this case, there was no sufficient evidence before the court to entitle the plaintiffs to recover, or to require the defendants to be put upon their defence. First, there was no proof that the premises had been ever vacant and unoccupied, or that they were *prima facie* without the bounds of any patent ; and secondly, there was no evidence that the defendants were in possession, or that they claimed title. Although the defendants' possession was asserted in the complaint and admitted in the answer, yet it was denied in the reply. The people are bound by the allegations in their pleadings, like individuals. Notwithstanding the reply was a clear departure from the complaint, and as such obnoxious to a demurrer, it is still binding upon the plaintiffs. The pleadings and the whole case show that at the time the plaintiffs rested, they sought, without any evidence of title

in themselves, to recover judgment against parties who, their reply asserts, never possessed the lands described in the complaint, and were never entitled to that possession. The judge erred, therefore, in putting the defendants upon their defence. The first exception was consequently well taken. But as the cause was subsequently tried upon its merits, and has been fully and ably argued by learned counsel in this court, it will probably be more satisfactory to all parties that we pass upon one or more of the questions which will be decisive of the action, not only in this but in any future litigation upon the same subject.

If either the patent of 1685, called the Dongan patent, or that of 1704, called the Cornbury patent, was sufficient to divest the crown of the title to the land embraced within its boundary lines, the present action cannot be sustained. The people at the revolution succeeded to the rights of the crown, and had the same right to repudiate public grants which the latter possessed, and no more. (1 *Greenl. L. N. Y.*, 31, § 14.) In considering this case, we must not lose sight of the fact already stated, that this is not an action to revoke those patents or either of them, and that the learned judge has found as a fact, that the patents were not, nor was either of them, obtained by any fraud, concealment or false suggestions, or recitals on the part of the patentees, nor was the king deceived in making said grants. This finding was, in my judgment, based upon sufficient evidence and arguments, and as it has not been appealed from by the people, it must be assumed as the law of the case, in the further discussion of the questions before us.

Although this is not a direct proceeding to vacate the patents, it cannot be denied that objections showing that they were absolutely void from the beginning are open to consideration. In a collateral action they cannot be assailed for any other cause. (*Jackson* v. *Marsh*, 6 *Cow.*, 281; *Jackson* v. *Lawton*, 10 *John.*, 23; *Jackson* v. *Hart*, 12 *John.*, 77;

*Bagnell* v. *Broderick*, 13 *Peters*, 436; *The People* v. *Mauran*, 5 *Denio*, 389.)

The learned judge by whom the cause was tried found, as matter of law, that the grant of lands in both patents was illegal and void, because manorial privileges and franchises were by both conferred upon the lord of the manor. And in his learned opinion, furnished to the court on the argument, he holds the Cornbury patent to be also void, because the Dongan patent had already conveyed all the title of the crown to the grantees therein named. If the reason for this latter opinion be correct, the plaintiff had not the slightest ground for a recovery, and judgment should have been given for the defendants. If the crown parted with all its title to the land in 1685, and that title had not been revested by escheat, or otherwise, it had indeed nothing upon which the patent of 1704 could operate, and nothing to which the people at the revolution could succeed; and consequently the latter had no cause of action.

The important question, therefore, is, was the Dongan patent of 1685 operative to convey the title of the premises therein described to the grantees therein mentioned. In considering this question, we must call to mind the issue which has been framed by the pleadings. The first issue on this point tendered by the plaintiffs is, that no such patent was ever granted; and the second is, that if granted, it was obtained by fraud or upon false suggestions, or concealment of some material fact on the part of the grantee or grantees, and was and is therefore void and of no force, effect or validity. The first issue is equivalent to *nul tiel record*, and is effectually disposed of by the production of the patent itself, or a legally authenticated copy. The learned judge did not overrule the defence on the ground that no patent, as described in the answer, ever existed. He concedes its existence, but asserts its invalidity on the ground of matter apparent on its face. The second issue,

though loosely framed, was disproved on the trial, and was expressly found for the defendants by the learned judge.

The judgment of the court below, that the Dongan patent was and is null and void, was therefore based upon a ground not set up in the pleadings, or put in issue by them.

It is not denied by the court below that the operative words of grant in the patent were sufficient to convey all the title of the crown of Great Britain to the land described therein to the grantees therein named in fee simple. Had it not been for the grant of manorial privileges and franchises in the same patent, I do not understand that the sufficiency of the instrument to convey land would have been questioned. We are then brought to consider whether a patent of land, granted by the colonial government in 1685, containing the appropriate words for passing the title in fee to real estate, is rendered void and inoperative, because in the same patent a power is conferred upon the grantees to hold a court leet and court baron, and to enjoy the other manorial privileges specified in the Dongan patent. The court below held it to be void for that reason alone.

There are two answers which may be given to this question : First, it was within the competency of the colonial government in 1685 to grant a manor, with the usual incidents and franchises of an English barony ; and second, if it had no such right, and nevertheless made such grant, in a patent which also, in a distinct part thereof, contained the usual grant of lands to the patentee, his heirs and assigns, the manorial grant alone will be void, and the grant of lands operative and effectual.

I do not propose to discuss the first question, although I believe the original grant to have been valid in this respect, and the acts of recognition by the colonial legislature to be of such a character as conclusively to estop the government from impeaching its validity in a collateral action. I shall leave this point, however, to be examined

by Judge DENIO.   Whether the manorial privileges were rightfully granted or legally enjoyed during the continuance of the colony, is not indispensable to the proper determination of this action, unless, indeed, the inserting of those privileges in a grant of lands invalidates the grant.   The latter, therefore, is the only point to be considered by me.

The two rules of most general application in construing a written instrument are: First, that it shall, if possible, be so interpreted that it shall be effectual, *ut res magis valeat quam pereat;* and second, that such a meaning shall be given to it as may carry out and effectuate, to the fullest extent, the intention of the parties. ( *Broom's Maxims*, 273, 414.)   The principles which govern the construction of private grants are, with some qualifications, applicable to grants from the government.   If the king's charter, says Coke, "will bear a double construction, one which will carry the grant into effect, the other which will make it inoperative, the former is to be adopted." ( *Rutter* v. *Chapman*, 8 *Mees. & Wels.*, 102, *in the Exchequer Chamber*, *per* TINDAL, Ch. J.)  In accordance with the same principle, where divers persons join in a deed, and some are able to make such deed and some are not able, this shall be said to be his deed alone that is able ( *Shep. Touch.*, 81), and if a deed be made to one that is incapable and another that is capable, it shall enure only to the latter. ( *Ib.*, 82.)   The same doctrine is applicable to the subject matter of a grant.   If with respect to a part of the thing granted, the grantor have a right to convey, and with respect to the residue he has no right, the deed will be available as to the part to which the grantor had title, and void as to the residue.   This rule prevails in relation to grants from the government.   In *Danforth* v. *Weur* (9° *Wheat.*, 673), both parties claimed title to the land in controversy under grants from different states. The grant to the plaintiff was of land, to a part of which the Indian title had not been extinguished, and which, according to law, was not the subject of grant; yet this

grant was held good as to the land where the Indian title had been extinguished, and void as to the rest. The same principle was again asserted by the same court in *Patterson* v. *Jenks* (2 *Pet.*, 236). A similar doctrine was advanced by the English Common Pleas in *Doe* v. *Pitcher* (6 *Taunt.*, 359), where a deed of land limited to a use within the statute (9 *Geo.* II., *ch.* 36), and therefore null, was held not to avoid other limitations in the same deed, not within the act. The case of *The People* v. *Mauran* (5 *Denio*, 389) is to the same effect. By the act of 1813 (1 *R. L.*, 202, § 5), all letters patent are required to contain an exception and reservation to the people of this state of all gold and silver mines. A patent was granted in 1816, conveying the premises therein described to the grantee, without the exception required by the statute. An ejectment was brought by the people to recover the land, and among other reasons in favor of their recovery it was urged that the patent was void for not containing the required exception and reservation. But the court held that the patent was good for the land and void for the mines. The rule which makes a deed or contract illegal in part, void in toto, applies only to cases where the two parts are so inseparably connected that one cannot exist without the other. The acts of agents who do more than they are authorized to do, rest upon the same principle. They are good for that which is warranted, and void for the rest. (*Co. Lit.*, 258; *Story on Agency*, §§ 166, 167; 5 *Denio*, 397.) In like manner, if a feoffment be made on condition to do a thing which is *malum in se*, as to kill or rob J. S., the estate of the feoffee is absolute, and a bond made on such condition is void. (*Bac. Abr.*, *tit. Condition*, *K.*)

In the present case, if it be admitted that a manor could not exist without a grant of land, it cannot be denied that a grant of land without manorial privileges is good. Upon every legitimate principle of construction, the estate granted by the patent was good and vested in the grantee, even if the residue of the grant was void. It follows, from the

foregoing reasoning, that the title to the premises embraced within the manor lines passed by the patent of 1685 to the grantees therein named, and is not shown to have ever reverted to the colony or to the people. The latter, therefore, had no right to maintain this action.

It is not necessary in the present action to establish the title of the present owners of this manor, nor would any further remarks be deemed necessary but to remove the doubts which the decision of the court below may be presumed to have cast upon the title of the Van Rensselaers to the unoccupied portions of the territory. The Dongan patent was granted to Killian the son of Johannes Van Rensselaer, and Killian the son of Jeremias Van Rensselaer, their heirs and assigns, in trust to and for the use and behoof of the right heirs and assigns of Killian Van Rensselaer, the grandfather, &c. The recitals in the patent of 1704, show that at the time of the latter patent, Killian Van Rensselaer, eldest son of Jeremias, had become solely seized and possessed of the whole colony of Rensselaerwyck, with the hereditaments and appurtenances. The latter patent, reciting the former, and the various facts which showed the title vested in Killian, confirmed the same to him, and his heirs and assigns forever. It must be admitted that these recitals and this act of the government were not binding upon other parties. The time which had elapsed since the patent of 1685, was long enough to have satisfied all the trusts contained in that patent, and they might well be presumed to have been satisfied, and the whole estate vested in Killian, the patentee in the last patent. Its effect was to vest in the patentee every latent interest of the crown, if any there remained. In an action to revoke a patent granted by the crown, the recital of facts not within the knowledge of the government are the suggestions of the patentee, and must, if material, be proved by him. The king is not estopped by a recital in his patent, but the law will rather adjudge him to be deceived. (1 *Co.*,

43 ; .5 *ib.*, 55 ; 6 *ib.*, 55 ; 10 *ib.*, 112.) But in the present case the pleadings do not put the recitals in issue, and the learned judge has found as a fact that neither of the patents were obtained by any fraud, concealment or false suggestions or recitals on the part of the patentee; and the action moreover is not brought to revoke the patent, but to recover the land upon the ground that no patent ever existed, or if it did, that it was void. A valid commencement of an estate is shown in the patentee under the patent of 1704, which, even if defective, ripened into a right more than a century ago, as against all the world. Either patent is sufficient to bar all right of the people to maintain the present action.

It remains to consider, though not very essential to the defence, some acts of recognition on the part of the government, of the existence and continued ownership of the patent by those in whom the paper title has been traced, and the acts of ownership which have been exercised without interruption by the ancestors of the present owners from the earliest day. These acts on the part of the proprietors consist of granting leases, collecting rents and paying taxes. The acts of recognition by the colonial assembly, by the constitution of 1777, and by the legislature of the state since the revolution, are numerous, and have already been referred to.

It has already been stated that a quit-rent of fifty bushels of wheat annually was reserved in both patents. By the act of April 8, 1801 (1 *K. & R.*, 605, 6, § 4), it was enacted that any person seized of any lands, &c., as contained in any original grant of the same, charged with an annual quit- rent, might commute for the same by paying to the treasurer of this state, for the use of the state, $1.50 for every twelve and a half cents of such annual rent. The section then points out the receipt which is to be given, describing the lands and tenements on which the said quit-rent was chargeable, the date of the grant reserving it, the sum paid

in lieu of it, the officers by whom it is to be countersigned, and the book in which it is to be entered, and enacts "that the said receipt or certificate being so countersigned and entered, or the entry thereof, shall be a good discharge of such quit-rent forever."

The defendants' counsel prove that on the 4th of November, 1752, all the quit-rents on the patent were paid from March 25, 1737, to March 25, 1752, being seven hundred and fifty bushels of wheat. It was also shown by the comptroller's certificate, that on the 26th of December, 1806, Stephen Van Rensselaer paid up all the arrearages of quit-rent on the upper manor, and commuted for the said quit-rent under the act of 1801. Two other receipts for quit-rent were given in evidence, one for fifty bushels of wheat, dated in March, 1687–8, and the other for three years' quit-rent, and dated December 1, 1705. The form of the commutation receipt was not according to the statute, nor was the apportionment proved to have been made between the upper and lower patents. The payment and commutation were made upon the upper patents, in which the premises in question are situated. The learned judge, in his consideration of the case, laid out of view the effect of these payments and commutations on account of the defect in the evidence by which they were sought to be established. But it appears by the bill of exceptions that the evidence was not objected to, and further, that "no objection was made to the form or sufficiency of the evidence, nor any question raised upon the trial or argument, on the facts as to the payment of and commutation for the quit-rents on the whole manor, but the cause was argued as if such commutation had been fully proved." Under these circumstances, the court below should have treated the cause as if the evidence had been conformable to the statute; and it should be so viewed by this court.

The objection that the rent was payable in wheat, and that the statute is silent as to the commutation of wheat

rents, is without force. The statute is general, and applies as well to rents payable in wheat as rents payable in cash. It is well settled in this state that rents payable in wheat, stand on the same footing as rents payable in cash. (2 *Barb.*, 643; 5 *Denio*, 121; 2 *Comst.*, 135.) As the payment of rent by a tenant is a conclusive acknowledgment of the paramount title of the landlord, so the receipt of rent by the landlord is an unequivocal recognition of the estate of the tenant. The effect of the commutation of the quit-rent is the same upon the rights of the parties as if the people had made a new grant of the patent, without reservation. Such grant enures to the tenant by way of extinguishment of the rent. (*Lit.*, § 543.) A grant of the rent to the tenant would have the same effect. (*Lit.*, § 544.) The receipt of the sum which the statute prescribes as a commutation of the rent, works not only under the act as a discharge of the rent, but as a confirmation of the estate. The reversion no longer remains in the people, and all the remedies of distress, entry and sale of the premises, provided by the statute in case of non-payment, are gone forever. The plaintiffs cannot, after having received rent on the patent for above a century, and at last the commutation money under the statute, maintain an ejectment for the same land, founded upon a supposed defect in the original grant.

As the cause must go back for another trial, and will again be tried if the attorney-general shall so elect, it may be well to pass upon the question of the statute of limitations, interposed in the answer. The people of this state have enacted that they will not sue or implead any person for or in respect to any lands, by reason of any right or title of the people to the same, which shall not have accrued within the space of forty years before suit for the same be commenced, unless the people, or those under whom they claim, shall have received the rents and profits thereof within the space of forty years. (1 *R. L.*, 184, § 1.) In the case of

*The People* v. *Arnold* (4 *Comst.*, 508, 513), this court held that to constitute a bar to the right of entry of the people, there must be such a holding for forty years as would constitute a good adverse possession, if the land had been owned by an individual instead of the state.

The court below held the statute applicable only to those parts of the manor which had been actually held under lease from the proprietors more than forty years prior to the commencement of the suit, and not available to the defendants with respect to this particular lot, because it had never been so occupied. I differ from the court below in this respect, and without adverting to the earlier statutes, am of opinion that the claim of the people is barred by the act of 1801. (1 *R. L.*, 184.)

Although for the purpose of this question it must be assumed that both patents were void, still the defendants' title is founded upon a written instrument purporting to be a grant from the colonial government embracing within its limits the premises in dispute. The court below overlooked the fact that the defendants and those under whom they claim paid both rent and taxes upon the whole patent, and therefore upon the lot in question; employed agents to protect the latter from trespassers, and finally actually leased it to a tenant a few years before the action was commenced. Moreover, they leased out all the land surrounding it to actual occupants. Here was a sufficient possession of the lot, though no one resided upon it, to bring it within the rule required by the statute of limitations. (2 *R. S.*, 294, § 10.) The statute was designed merely to enact what had been decided by the courts. (6 *Cow.*, 679, 623.) It was merely declaratory. If the defendants had such a possession as to enable them to be sued in ejectment, they had such possession as would, if continued long enough, ripen into a right. If they had such possession as to be liable to taxation, they ought not, in common fairness, to be treated as having no pos-

session by the government which both imposed and collected the taxes.

The remarks of the learned judge in the court below with reference to the improvidence of the grant of so large a territory to a single individual, would have been appropriate, if addressed to the colonial government by whom it was made. But the question for the courts is, not whether the mode of granting patents of large tracts of land to single individuals was best adapted for the good of the colony, but whether the grant in question was in fact made. The one is a question of public policy, which the experience of modern times has wisely settled adversely to the practice which prevailed in the infancy of the colony. The other is a mere question of fact, which must be decided by the record of the grant, or acts of recognition by which its existence can be inferred. Many of the acts on the part of the state, and of the late colony of New-York, have already been noticed; and there are numerous others of the like character, tending strongly to confirm the title under which the defendants claim. But I have not deemed it expedient to dwell longer upon this subject.

The conclusion to which I have come, that the patents were both valid, and were effectual to divest the colonial government of all title to the land in dispute, is enough to dispose of the case upon its merits. I think, too, a regular paper title has been deduced from the original patentee to the present owners, and that their title is good against all the world.

The judgments of the supreme court and circuit court should both be reversed, and a new trial ordered with costs to abide the event.

DENIO, J.   The material facts in this case are very simple. On the fourth day of November, 1685, in the first year of the reign of King James the Second, Dongan, the colonial governor, acting in behalf of the crown, granted in fee to

two persons, both named Killian Van Rensselaer, and being, as it seems, cousins and descendants of another Killian Van Rensselaer, their common grandfather, a large tract of land, of which the premises in question are a part, to hold the same in trust for the right heirs and assigns of Killian Van Rensselaer, the grandfather, subject to a quit-rent of fifty bushels of good winter wheat.

About twenty years afterwards, in the third year of the reign of Queen Anne (*Anno Domini* 1704), the crown, by Lord Cornbury, then colonial governor, by patent under the seal of the colony, reciting the former patent and a great number of antecedent transactions tending to show that the Van Rensselaers were entitled to the land from the former Dutch government, and reciting also, that one of the former patentees had died without issue, whereby the other of them, described as the eldest son of Jeremias Van Rensselaer, became solely seized and possessed of the granted premises, gave, granted, and confirmed unto the surviving Killian Van Rensselaer, his heirs and assigns forever, the tract of land described in the former patent, to be holden of the Queen, her heirs and successors, in free and common socage, yielding and paying a yearly rent of fifty bushels of wheat in lieu and stead of all other rents, services and demands whatsoever.

The defendant, William P. Van Rensselaer, showed title under the last patent, by devise and inheritance from the last mentioned patentee.

The defendant's grandfather came to the title in 1747 and died in 1769, and during his time commenced conveying the premises in farms upon durable leases, which practice was continued by his successors in the title, so that in 1812, about eight-tenths of the lands had been thus disposed of. The premises for which the suit is brought are about one hundred and fifty acres, part of a parcel of two thousand acres of wild and unappropriated land. If either of these patents were operative grants, the defendant has shown title

out of the people, and it is not important to inquire whether
there are persons in existence, besides the defendant, who
could make title under the heirs of Killian Van Rensselaer,
the grandfather of the first patentees.

There is no pretence that the crown or the state has ever
acquired title by forfeiture or escheat, or in any other way
under the heirs of the first mentioned Killian, so that this
case turns wholly upon the validity of the patents. The
provisions which it is argued render the patent utterly void
are those which profess to create a manor in the granted
premises. It is declared in the first mentioned patent, and
repeated in substance in the other, that the grantor makes
and constitutes the tract a lordship and manor to all intents
and purposes, to be called the Manor of Rensselaerwyck.
The grantees are authorized in terms to hold a court leet
and court baron, to award fines, have the customary writs,
&c., to have the waifs and estrays, deodands, &c., and the
patronage of any churches to be erected on the tract; and
the freeholders of the manor are empowered to elect a rep-
resentative to sit in the general assembly in the province
of New-York. There is nothing in the patent, which, in
terms, empowers the patentees to grant lands to be
holden of themselves; but it is argued that the erection of
a manor and the authority to hold the courts mentioned,
which according to the English law are manor courts, neces-
sarily implies the power to create suitors, who must of
necessity be tenants holding of the proprietor of the manor,
owing him suit and service. (*Glover* v. *Lane*, 3 *Term R.*, 445.)
This, it is said, is a violation of the statute, called *quia
emptores terrarum*, passed in the eighteenth year of Edward
first (*Anno* 1290). This statute, after reciting that the feudal
tenants have sold their lands to be holden in fee of them-
selves, instead of the chief lord of the fee, whereby those
lords have lost their escheats and other feudal perquisites to
their "manifest disinheritance," enacts that "forever here-
after it shall be lawful to every freeman to sell at his own

pleasure his lands or tenements, or part thereof, so never-theless that the feoffee shall hold the same lands or tene-ments of the same chief lord of the fee and by the same services and customs as his feoffor held them before." A second chapter provides for an apportionment of the services in case of a sale of a part of the land out of which they issued. (*Coke*, 2 *Inst.*, 500.)

The freedom of alienation thus conferred upon the mili-tary tenants was undoubtedly a very material amelioration of the severity of the feudal system, but at the same time the main object of the statute would seem to have been to secure to the great barons their profits arising out of these tenures. It is stated in the statute itself that it was ordained " at the instance of the great men of the realm," and it was clearly for their protection, though incidentally, and probably by its unforeseen operation, it proved a great relief to the inferior tenants. The evil was, that the chief lords were defrauded of the fruits of the tenures, and the remedy provided was, that every tenant, however remote, should remain the debtor of the chief lord instead of his immediate feoffor for the services incident to the tenure.

But as one may generally waive an advantage secured to himself, so it was held that the chief lord might forego the benefit of the statute by authorizing his tenant to make a subinfeudation, that is, grant lands to be holden of himself; but this could not be done by a mesne lord on account of the interest of his superiors. COKE, in commenting on the words, " so nevertheless, that feoffee shall hold, &c., of the same chief lord," &c., says : " These general words have a tacit exception, viz: unless all the lords mediate and immediate do assent thereto ; for *quilibet renunciare potest beneficium juris pro se introductum.*" For this, two cases are referred to from the Year Books. In one of them the court holds this language : " But the king can license his tenant to make a feoffment to hold of himself; so can any one by the license of the lords mediate and immediate make a feoffment to

hold of himself, notwithstanding the statute *quia emptores ter·rarum ;* for this was made for their advantage, and therefore they can dispense with it." (*Year Book*, 27 *H*. 8, *pl*. 26, *c*. 5.)

As the king is lord paramount in all feudal tenures, no subject, since the statute, can, by his own authority, create a manor ; and, as in England, all the land was granted at or soon after the conquest, it follows that English manors must have their origin prior to the eighteenth of Edward first. But as the king does not hold of any superior, he may grant land to be holden of himself, "for," says COKE, "hereby no man is restrained but he which holds over of some lord, and the king holds of none." (2 *Inst.*, 67.) Therefore, if there are crown lands in England at this day, which have never been granted to a subject, they may, without doubt, be erected into royal manors. And cannot the king grant to his immediate tenant the right to make grants to be held of himself, the tenant, since thus there would be the assent of all the lords, mediate and immediate ? The king's tenants *in capite* could not make such grants before the statute *quia emptores* without his consent. (*Lewis on Perpetuities*, 13, 14.) This was by force of the king's prerogative, and was an exception to the general rule which permitted subinfeudations by all lords except the tenants *in capite*. But I think that as well since as before the statute, the king could license his immediate tenant to alien to hold of himself, the tenant. In grants in *frankalmoigne*, the grantee necessarily holds of the donor, and not of the superior lord, because the services can only be rendered to the donor or his heirs, being generally to pray for his and their souls. (2 *Bl. Com.*, 101.) LITTLETON, moreover, says that no common person can, since the statute, grant lands in *frankalmoigne*, because he cannot alien to be holden of himself, "but (he says) the king may give lands or tenements in fee simple to hold in *frankalmoigne* or by other services, for he is out of the statute." (§ 140.) In his observations on this section COKE says that a license of the lords mediate

and immediate shall enure as a dispensation of the statute *quia emptores*, so that as to lands already granted the consent of the king and all the lords mediate and immediate dispenses with the statutes; for " *alienatio licet prohibeatur, consensu tamen omnium in quorum favorem prohibita est, potest fieri.*" (*Co. Lit.*, 99, *a ;  see Hargrave's note, No.* 108, *where it is shown that the dispensation referred to is not the exercise of the unconstitutional prerogative of dispensing with statutes which was declared illegal at the revolution.* 1 *Thomas' Co. Lit.*, 363.)   So also in the *Natura Brevium*, a book of great authority, at the place where grants in *frankalmoigne* are treated of, the author says, after declaring that the king may grant in *frankalmoigne*, " But it seemeth that another lord cannot grant such license to his tenant by reason of the interests of the lord paramount, but the king and all the mesne lords together may grant licenses unto the tenants paravail who have the fee of the lands, that they may alien the same to an abbot or prior to hold of him in *frankalmoigne*, or to grant the same unto a lay person to hold of him by certain services ; because that the statute of *quia emptores*, &c., was made only for the advantage of the lords, and therefore they may all dispense with the statute." (*Fitz. N. B.,* 211.)   The principle is laid down in the same way in *Bacon's Abridgment.*   " As the statute *quia emptores* was made for the advantage of the chief lords, the king may dispense with it and license his tenant to reserve any new service.   No other lord can do this, by reason of the king's interest as lord paramount, but the king and the mesne lord or lords may together dispense with the statute and grant a license to the tenant paravail." (*Tit. Tenure, B.*) Assuming the law to be as in these authorities stated, and assuming further, as the respondents' counsel contends, that the grant of a manor and the right to hold manor courts, *ex vi termini*, implied an authority in the patentees to create manor tenants by means of grants reserving services to themselves, it still seems ·clear that the patents were no

violation of the statute so often referred to. The patent so construed was itself a license to the patentee to make grants to be held of himself. On the making of such grants the patentees became the mesne lords, holding of the king, and the grantees of the patentees were the tenants paravail, holding, by license from the king as lord paramount, of their immediate lords the patentees. The statute would prevent any further subinfeudations by the freeholders holding under the patentees, unless, indeed, the king and the patentees should both consent.

That this was the understanding of the crown lawyers, who prepared the patents for lands in the colonies, is evident from the terms of several colonial grants. The charter of Pennsylvania empowered Penn, the patentee, to erect manors and to alien and grant parts of the lands to such purchasers as might wish to purchase, " their heirs and assigns, *to be held of the said William Penn,* his heirs and assigns, by such services, customs and rents as should seem fit to the said William Penn, &c., and not *immediately of the said King Charles, his heirs or successors,*" with a *non obstante* of the statute *quia emptores terrarum.* (*Ingersoll* v. *Sargeant,* 1 *Whart.,* 348; *Kirk* v. *Smith,* 9 *Wheat.,* 256.) It was stated on the argument, and not denied by the respondents' counsel, that the records of some ten or twelve patents exist in the office of the secretary of this state, issued respectively in the reigns of James II., William and Mary, Anne and George I., with powers respecting a manor and manor courts similar to those in the patents under consideration; and that the proprietary charters of several of the colonies authorize grants to be made to hold of the proprietaries. If the statute against subinfeudations was in force in the colonies, these proprietary grants were as much violations of its provisions as the grants in question in this action or any other grants from the king. The practice of making such grants for a long course of years is pretty strong evidence

that the statute was never understood to apply to grants by the king.

But I think we are not without some evidence of the practical existence of the exception contended for in respect to lands in England.    In *Sir John Molyn's case* (40 *Eliz.*) there had been an ancient manor of which the king was lord paramount, and there was a mesne lord and tenant; and it being forfeited to the crown for treason, it was again granted by King Edward third, to hold of him and other chief lords of the fee; and it was decided that this manor should be held of the mesne lord. (6 *Rep.*, 6.)   See also *Bewley's Case* to the same effect. (9 *Rep.*, 130, *a.*)

The remarks of several writers cited in the opinion of the court below are readily reconcilable with the doctrine which has been stated, when read in connection with what precedes and follows the language referred to.   It should be remembered that all the land in England was in tenure long before the statute of Edward first, and also that copyhold manors, to which the authorities relied on generally relate, do not arise out of feudal grants, but the tenants hold by the will of the lord according to the custom of the manor, time whereof, &c., ( *Comyn's Dig.*, tit. *Copyhold, A;* ) and that all copyholds are regularly parcel of a manor.

It is in respect to that species of manors, that it is said they cannot begin at this day. (*Id.*, Q, 3.)   So the note in *Petersdorff's Abridgment* says, " manors cannot now be created, not even by the king himself," but the reason is given which shows that the subject treated of is copyhold manors, thus : " *length of time being of the very essence of a manor*, and, as Sir EDWARD COKE expresses it, such things as receive their perfection by the continuance of time come not within the compass of a king's prerogative ; therefore the king cannot grant freeholds to hold by copy, and cannot create a custom." (6 *Petersd.*, 309.)   The general expressions of writers and judges to the effect that manors cannot have a commencement since the statute of Edward are quite correct, if we

add the reason which is always understood, viz., that all the lands in England are already in tenure, and subinfeudations are forbidden by the statute. The remark was never applicable to the ungranted crown lands in the colonies, upon which the statute, I think, never had, any or only a qualified bearing. I have considered this question as though the statute was in force, and controlled the tenures in this colony in any case to which in England it might be applicable; and I do not think it material to deny the proposition, though it has been questioned by respectable authority. (*Jackson* v. *Shutz*, 18 *John.*, 179; *Depeyster* v. *Michael*, 2 *Seld.*, 467; *Ingersoll* v. *Sargeant*, 1 *Wharton*, 348.) Whether it was generally in force or not, it did not, in my opinion, apply to the ungranted crown lands; and in respect to these, the king, I think, was competent to authorize his immediate grantees to create tenants of a freehold manor by granting lands to be held of themselves. It will not be supposed that all the vexatious incidents of the feudal tenures could be engrafted upon these manor lands. If the feudal system ever prevailed in the American colonies, it had been shorn of its most severe features before either of the grants in question was made, by the statute 12 Charles II., *ch.* 24, (*Anno* 1664), which abolished the peculiar incident of the military tenures, and changed them, whether holden of the king or others, into free and common socage; and which was reënacted in this state soon after the revolution, with a retrospect to the time of the passage of the English statute. (1 *Greenl.*, 359, § 2.)

But suppose all that we find in the patents about a manor and manor courts is inoperative on account of the provisions of the statute against subinfeudations, it by no means follows that the grant of the lands is void. It seems not to have been unusual, after the passage of the statute, for men still to alien their lands to be holden of themselves upon the same services on which they held them, and sometimes upon different services. The consequence was held to be that the alienee held of the chief lord by the old services, as the

statute requires, and not that the feoffment was void on account of the tenure illegally attempted to be created. (*Co. Lit.*, 502, *pl.* 7.) It is said that if a patent contains an allegation of untrue matter expressed to be suggested by the grantee, by means of which it can be affirmed that the king was deceived, the patent will be adjudged void; " but when the words are the words of the king, and it appears that he has only mistaken the law, then he shall not be said to be deceived to the avoidance of the grant," " and if the king is not deceived in his consideration, nor otherwise to his prejudice, but his intent was to pass the lands, only he is deceived in the law, nevertheless his grant shall be good." (*Rex* v. *Kempe*, 1 *Ld. Raymond*, 49.) In *Gledstanes* v. *The Earl of Sandwich* (4 *Man. & Gr.*, 995), the principle which I have extracted from the case last cited is approved of and applied by the court of Common Pleas. It is argued in behalf of the respondents that the grant of a manor is inseparable from the conveyance of the lands. But it seems to me that they are easily separable. By the last patent the land is conveyed to the patentee, his heirs and assigns, to be holden in free and common socage. This is the ordinary language of a grant in fee simple by a lawful tenure. If what is said about a manor and manor courts implied a right in the patentee to convey to others to be holden of himself, and that was unlawful, there is no legal difficulty in declaring the patentee entitled to retain the lands, but holding that his alienee must hold of the crown and its successors, instead of holding of the patentee and his heirs. The case is similar in principle to *Darling* v. *Rogers*, decided in the court for the correction of errors. (22 *Wend.*, 483.) An assignment of lands for the benefit of creditors authorized the trustee to mortgage as well as to sell, but the power to mortgage being a trust not authorized by the Revised Statutes, was void. The court, however, held that this did not avoid the conveyance, and they applied the maxim *ut res magis valeat quam pereat*, that

the instrument should rather be made available than suffered to fail, and held that the land passed by the assignment.

I am also of the opinion that the people are barred from maintaining this action by the statutes of limitations. The statutes which bar the right of the state contained in the revisions of 1801 and 1813 are, in most respects, if not altogether, mere revisions of the one passed in 1788, divested of its cumbrous phraseology. (2 *Greenl.*, 93, § 1; *Laws* 1801, *ch.* 183; 1 *R. L.*, 1813, 484.) I do not see, indeed, that there is any difference material to the case. The appellants' counsel supposed he had discovered in the language "unless the people of the state of New-York have, or shall have been answered by force and virtue of any such right or title to the same, the rents, revenues, issues or profits thereof, or the rents, issues or profits *of any manor or other hereditaments whereof the premises in question shall be part or parcel* within the said space of 40 years," a principle which would give the possessor of part of a manor, claiming title to the whole, the benefit of the statute in respect to a portion of it of which he had not possession. But a careful reading of it will show, that it is the people who are to be benefited by receiving the rents of part of a manor, as that circumstance will enable them to avoid the bar of the statute, as to the portions in respect to which they have been kept out of the rents. The question then is, whether the appellants can invoke the protection of the statute as to the lot in question, it not having been in actual occupation under their title prior to the year 1836 The tract patented was far too large, to make the possession of even a large part under a claim and color of title to the whole, a good constructive possession of the parts not occupied, under our decisions. (*Jackson* v. *Woodruff*, 1 *Cow.*, 286; *Jackson* v. *Richards*, 6 *id.*, 617; *Sharp* v. *Brandow*, 15 *Wend.*, 597. See also, 2 *R. S.*, 294, §§ 10, 11.)

Nor do I think the right given by the leases to take wood for fuel and fencing from the ungranted lands, or the other

The People *against* Van Rensselaer.

acts of ownership which have been mentioned, are sufficient to make out a constructive possession of this lot. But there is another view of the case which I think renders the statute applicable. The crown of England conveyed these lands subject to the payment of a small rent in kind. This rent was claimed, and paid, down to 1806, when it was commuted, under an act of the legislature, by the payment of what was considered a fair equivalent. (1 *Webs.*, 605, §§ 1, *et seq.*) This rent was claimed and paid as well for the unoccupied portions of the land as for the parts which were occupied. It was the conventional equivalent between the parties for the whole lands patented. It accrued annually, and if not regularly paid, it was ultimately liquidated upon the basis of an annual ground rent upon a grant in fee. There is no evidence, nor any reason to believe, that the liability to pay it was ever denied or questioned. Neither the crown nor the people were ever disseized of it. The relationship between the crown and the people on one side, and the patentees and their successors in the title on the other, continued in full activity until the quit rent was finally extinguished. This relationship was a perpetual admission and agreement that the parties holding under the patents were in the possesion and enjoyment of the subject for which the quit-rents were the equivalent, that is, of the actual fruits and profits of the soil. Its existence and constant recognition was entirely hostile to the idea that the grantors were in the perception of anything growing out of the land, except what had been secured to them by the contract contained in the grant. It concedes that the patentees and their successors were constantly enjoying all the rights which the patents professed to convey to them; and they were paying to the grantors and their successors the consideration for such enjoyment by them, which had been stipulated between the original parties to the grant. The exception which the people now set up is, that in judgment of law, they and the crown of England, to whose rights

they have succeeded, have always been in the receipt of the rents and profits of this lot.    This is made out by applying the principle, that unoccupied lands are, in law, considered as held in subordination to the true title.   Assuming that the patents are void, it is argued that the government was always legally in possession of this unoccupied lot, and that as possession draws after it the fruits of the land, it was always in the receipt of the rents and profits. That this is the theory upon which the bar of the statute is answered when the defendant cannot make out an adverse possession, *The People* v. *Arnold*, (4 *Comst.*, 508).    The statutes, prior to the revision of 1830, do not say anything about adverse possession, and the reason why that was required of one setting up the statute, was that otherwise the land was deemed to be held in subordination to the true title.    The owner was never, therefore, out of possession, but was constantly in the receipt of the rents and profits. It was upon this principle that it was held by this court, in the case just referred to, that a plea denying that the title accrued within forty years, and denying, also, the receipt of rents and profits by the people within that time, was a good bar.    The proof in this case would establish such a plea.    It is true the people have, in one sense, received the rents and profits.    They have received the quit-rents; but the statute of 1788 requires that they should be received "by force and virtue of such right and title," that is, the right and title asserted in the action which is sought to be barred.    The title by which the quit-rents were received by the government was the reservation in the patent which admitted the right to the general profits to be in the patentees.    The title sought to be established by the action is not the title to the rent, which was never questioned, but the general and absolute title to the land in hostility to all rights under the patent.    The distinction referred to is as old as the days of Lord Coke.    In 3 *Inst.* (*p.* 188), there is an able commentary upon the 21. James I., *ch.* 2, the first

*nullum tempus* act, which in the particulars under consideration, as in most others, is literally the same with our act of 1788. "In this branch of the act," he says, "these words (answered by force and virtue of any such right and title to the same, the rents, revenues, issues and profits thereof), were materially added; for otherwise if the king had been answered the rents, revenues, &c., by reason or pretext of wardship, primer seisin, extent or the like, it might have made a doubt whether such an answering of the revenues, &c., had been within the act: which doubt is cleared, that it must be by force and virtue of any such right or title *whereby the king impeacheth the state of the subject.*" In other words, he must have been answered the rents and profits, that is, have received them by the right and title he asserts in the action; else it is not within the saving of the statute.

It is well settled that a grantee may hold adversely to his grantor. (*Blight's Lessee v. Rochester*, 7 *Wheat.*, 535; *Osterhout v. Shoemaker*, 3 *Hill*, 518; *The Propagation Society v. Pawlet*, 4 *Pet.*, 506.)

I concede that an adverse possession is generally essential to enable a defendant to set up the statute in an action by the people, as well as where it is brought by an individual. (*The People v. Arnold, supra; The People v. Livingston*, 8 *Barb.*, 253; *The People v. Van Rensselaer, id.*, 189; *La Frombois v. Jackson*, 8 *Cow.*, 589.) The rule is absolutely necessary to protect the title of the state to its public lands. Possession being an act of great notoriety, it is required to exist before the statute can commence to run; for the reason that by it notice is conveyed that the right of the state is questioned. So in actions between individuals there must be a possession, and it must be hostile to the true owner, before the statute can operate, in order that the owner may be put on inquiry, that his rights are challenged. Now where the adverse holding is under a grant in fact from the party seeking to recover the land, though it may

be inoperative in law, and there is a duty to be annually performed by the grantee and his assigns to the grantor, as a consideration of the grant, and this duty is recognized and performed for forty years, both parties being actually participant in its performance, though the grantee has not taken actual possession of the land, it seems to me preposterous to say that the grantor has been all the time, in judgment of law, in the possession of it and in the reception of the general rents and profits. On the contrary, it appears to me that the consent, recognition, payment and reception of the quit-rents is undeniable evidence that as between these parties the possession is in the grantee; certainly it is an admission that it is out of the grantors.

Under such circumstances the actual occupation is immaterial. If this view of the question is correct, the respondents were barred in 1800, when the first statute commenced to operate; and if not then, certainly in 1801, when the second statute was passed; for at either period the appellant could allege that the people's title had not accrued within forty years, and that within that time the people had not received the rents or profits of the land. Since the extinguishment of the quit-rents, the evidence of which was not objected to, and which was *prima facie* sufficient to prove the fact, the appellant has held in pursuance of the implied assent of the legislature, which has done no act impairing the effect of that transaction. Whether this commutation of the rents should be held to transfer a title, assuming that the patents were originally void, or not, it is clearly enough to disprove the allegation that the people have since been in the reception of the rents and profits of the land.

On each occasion of the repeal of a former statute of limitations to make way for the revised one, there has been a saving of rights accrued under such repealed statute. (*Laws of* 1801, *ch.* 189, §1; 2 *R. L. of* 1813, 556; 2 *R. S.*, 779, §5.) Each of the statutes limiting actions by the state to recover lands, prior to the revision of 1830, contained a

provision in effect conferring a title upon the party having or claiming manors or lands as against the state and against certain other patentees. I am of opinion, therefore, that whenever the parties holding under these patents were able, after 1800, to set up that they had been in possession of part of the granted lands, claiming the whole, for forty years, and during that time had been paying and the state had been receiving the quit-rents reserved by the patents for the whole land, such parties established a title as against the state by force of the statute of limitations, which could not be questioned except by the accruing of a new title by escheat or forfeiture, or a reconveyance to the people. And this defence the proprietors of the patent could make at any time after the act of 1788 took effect until 1806, when the quit-rents were extinguished, and I think at any time before this action was commenced. ( *See Jackson* v. *Oltz*, 8 *Wend.*, 440.)

I have said that the evidence of the extinguishment of the quit-rents was sufficient. The statute (1 *Webs.*, 607, § 6) declares that the treasurer's receipt or certificate of the payment of arrears of quit-rents, and of the commutation, countersigned by the comptroller, shall be a good discharge. The paper produced was the comptroller's certificate, stating the money to have been paid to the treasurer, and containing the matter required to be stated in the one which was to have been signed by the treasurer. The quit-rent reserved was fifty bushels of wheat; but the crown had afterwards granted the manor of Claverack out of the lands which were comprised in the patents to Killian Van Rensselaer, and the public officers concerned in the commutation apportioned the fifty bushels of wheat between the manors, charging the one now in controversy with forty bushels; and the arrears and commutation were reckoned on that basis; but there was no evidence of an actual agreement to that effect between the proprietors of the two

manors. The bill of exceptions states that no objection was made to the form or sufficiency of the evidence, nor any question raised upon the trial or argument as to the payment of or commutation for the quit-rents on the whole manor; but it is stated that the cause was argued as if such commutation had been fully proved. After this it is too late to object in a court of review against the sufficiency of the evidence. It was the payment of the arrears and commutation which operated, and not the documentary evidence of it. The evidence, *prima facie*, established these facts, and if the documents were defective in form or any preliminaries were required to be shown, the presumption is that the defects would have been supplied if the objection had been duly taken. The principle is very familiar. In the opinion of the court below, it is said that if the commutation had been legally established, it would have been such a recognition of the title as would have precluded the state from disputing the defendant's title; but that operation is denied to it from a supposed defect in the evidence. It is clear that the court inadvertently overlooked that part of the bill of exceptions to which I have referred. I am inclined to agree with the court as to the effect of the transaction; but not having examined the point fully, I prefer to put the case on the other grounds.

I am of opinion also that the colonial act of May, 1691, which was approved by the crown, would protect the appellants against this action if there was nothing else in the case. (*Brad. Laws*, 7, 77; *see also a transcript of the act in* 8 *Barb.*, 291.) It was passed subsequently to the patent of Governor Dongan. The answer to this defence is: First, that the act did not undertake to confirm individual grants, but only charters of corporations; and second, that it was only intended to prevent the government established at the revolution from repudiating the acts of the one which it superseded, and did not apply to defects which would have

avoided the grants under the former government.    (1.)  The most prominent object, unquestionably, was to ratify corporate and municipal grants; but I think the language is large enough to embrace and that it was intended to embrace royal grants of land to individuals.    The act is inartificially worded; manors were supposed to be corporations, and under that name it was intended to confirm them.    " All the patents, charters, grants, made, given and granted, and well and truly executed under the seal of this province, constituted and· authorized by their late and present majesties, unto the several and respective corporations, or bodies politic of the cities, towns and *manors,* and also to the several and respective *freeholders* within the province," are to be held valid against their majesties, their heirs and successors. (§ 1.)    The second section ratifies and confirms the charters, patents and grants aforesaid,  " made, given and granted as aforesaid, unto all and every the several and respective corporations or bodies politic of the cities, towns and *manors ; and also unto all and every the respective freeholders, their heirs and assigns forever.*"    The intent to embrace grants in fee to individuals, seems to me to be nearly as strong as language could make it.    There are, extant, grants to the freeholders of towns as a sort of corporation (2 *Wend.,* 110), but these could not have been intended, for it is to the several and respective freeholders within the province; and then it is not to their successors, as in these *quasi* corporate grants, but to their *heirs* and assigns forever; and this language could not be applied to any subject with which I am acquainted, except the grants of land to individuals.    The proviso to the second section, which declares that the act shall not bar any person or persons of their "former and just rights to any house, tract or parcel of land within this province," provided they make their claim in five years; and the saving of the rights of idiots, minors, persons *non compos mentis,* and beyond the seas, strongly confirms this

construction. (2.) That the act was suggested by the change of dynasty effected by the revolution of 1688, is undoubted; and one object may have been to prohibit the new reigning house from revoking the grants of its predecessors; though there was no pretence that James was an usurper, and the revolution did not proceed upon that ground. But the principal thing to be provided against was the disturbing of chartered and vested rights under color of law. This is shown by the *non obstante* clause. The charters, patents, &c., are to be deemed valid, " notwithstanding of the *want of forms in the law*, or the *non-feasance* of any *right, privilege or custom*, which ought to have been done heretofore by their constitutions and direc tions contained in their respective charters, patents and grants aforesaid." The reign of James II. was memorable for writs of *quo warranto, scire facias* and for judgments of ouster, and of repeal of letters patent, rendered by judges who complied too readily with the temper of the times and the wishes of the monarch. ( 2 *Macaulay's Hist.*, 311. ) The statute in question was designed to secure the corporate and individual rights which the people of this colony derived from royal charters and grants, against all such arbitrary and corrupt proceedings, which, for anything which was known, might be resumed by the new or by some future government. It was a time for obtaining new guaranties for personal and proprietary rights, and the colonies were allowed to participate in this new order of things. The patent being confirmed by an act of the legislature, approved by the crown, was no longer liable to be set aside by the courts for want of form, or for non-user of privileges or breach of the conditions contained in it, or any other alleged illegality. If, therefore, this patent were void for the reasons which have been urged, it was ratified and confirmed by this act of the colonial legislature, and cannot now be impeached.

Upon the whole case, I do not think there was any ground for maintaining this action, and am of opinion that the judgment of the supreme court ought to be reversed.

The whole court concurred.

Judgment reversed.